NOTICE
Decision filed 02/29/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220068-U

NO. 5-22-0068

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Fayette County. |
| | ) | |
| v. | ) | No. 20-CF-175 |
| | ) | |
| ROBERT A. BRANHAM, | ) | Honorable |
| | ) | J. Marc Kelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: Cause remanded with instructions for the trial court to conduct a hearing to address the defendant's ineffective assistance of counsel claims, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and to determine, based on the trial court's conclusion following the hearing, whether additional proceedings are required.

¶ 2    The defendant, Robert A. Branham, appeals his convictions and sentence, following a jury trial in the circuit court of Fayette County, for five counts of criminal sexual assault. For the reasons that follow, we remand this cause for the limited purpose of a proper *Krankel* inquiry in the circuit court.

¶ 3    Prior to doing so, we examine the defendant's other claims that his speedy trial rights were violated by the circuit court's orders related to the COVID-19 pandemic, that there was insufficient evidence to sustain the convictions beyond a reasonable doubt, and that prejudicial plain error

1

occurred. We address these claims first because if the defendant prevails on any of these three claims, there is no need to remand for a *Krankel* inquiry due to the principles of double jeopardy which would bar the retrial of the defendant, or a new trial would be required. Ultimately, for the reasons that follow, we reject defendant's arguments as to these other claims. We do not reach the remaining issue raised by the defendant, of ineffective assistance of counsel, but retain jurisdiction to consider it, if necessary, following the *Krankel* inquiry. See, *e.g.*, *People v. Bell*, 2018 IL App (4th) 151016, ¶¶ 3, 36-37; see also *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 22.

¶ 4                                     I. BACKGROUND

¶ 5      We recite only those facts necessary for an understanding of our disposition of this appeal. On August 3, 2020, the defendant was arrested and charged, by information, with five counts of criminal sexual assault, all Class 1 felonies. Count I alleged that between March 5, 2018, and July 7, 2020, the defendant committed an act of sexual penetration with a minor, A.H., in that by the use of force he placed his penis in the mouth of A.H. Count II alleged that between March 5, 2018, and July 7, 2020, the defendant, a family member of A.H., committed an act of sexual penetration with a minor, A.H., by placing his penis into the vagina of A.H. Counts III, IV, and V alleged the same conduct as in count II, but as additional and separate offenses. Each count alleged that A.H. was under the age of 18 years when the alleged offenses occurred. Bail was set, and the defendant remained in custody throughout the remainder of the criminal proceedings.

¶ 6      During pretrial, the defendant filed a motion to reduce bail and made a speedy trial demand on August 7, 2020. On August 13, 2020, a grand jury returned a true bill of indictment charging the defendant with the same offenses. On August 18, 2020, the defendant's motion to reduce bail was heard and denied. On August 25, 2020, the defendant was arraigned on the charges in the indictment, and a trial was set on November 16, 2020. On October 27, 2020, the defendant filed a

motion to compel discovery and for sanctions alleging the State failed to provide recorded statements made by defendant and the minors that were referenced in the police reports. A hearing on the motions occurred on November 9, 2020, where defense counsel argued he could not proceed to trial on November 16, 2020, because the State had failed to tender certain video statements and that any delay should be attributed to the State for the purposes of calculating speedy trial. Further, defense counsel argued the defendant should be released on his own recognizance, because the next jury trial setting is not until January and would be outside of the 120-day time period for speedy trial. The circuit court ordered the State to comply with discovery and set a status hearing on November 12, 2020. On November 12, 2020, defense counsel indicated that he received supplemental discovery, but stated he could not proceed to trial on November 16, based on the materials received. Defense counsel reasserted that the delay should be attributed to the State. The circuit court granted the defendant's motion to vacate the jury trial set on November 16, but did not make a determination regarding delay; instead, the circuit court set the matter for "a motion for bond reduction or for an order in regards to the speedy trial issue" on December 1, 2020, and rescheduled the jury trial on January 18, 2021.

¶ 7      On December 1, 2020, defense counsel argued that the State failed to comply with discovery in a timely fashion, and that some evidence was not properly preserved; thus, delay should be attributed to them. The State conceded that the delay was attributable to them from August 3 to August 11, and from August 25 through November 16. Further, the State argued that by their calculations there were 27 days left on the speedy trial time. The State noted that on November 16, 2020,[1] Chief Judge Koester of the Fourth District Circuit Court issued administrative order 2020-40 that tolled speedy trial time until January 4, 2021. Thus, the State

_____

[1]Defense counsel noted that administrative order 2020-40 was entered on November 18, 2020. It is not clear from the record which is the correct date.

argued that defendant's speedy trial time would not lapse until January 31, 2021. The circuit court denied the defendant's motion to reduce bail and found that the "delay is attributable to the COVID crisis pursuant to numerous Administrative Orders, which have been entered, including incorporation of Illinois Supreme Court orders."

¶ 8 At a status hearing on January 12, 2021, the circuit court indicated that pursuant to Illinois Supreme Court's directive, all January jury trial settings were vacated. Defense counsel objected to the continuance of the trial. The defendant's objection was noted and denied, and the trial court reiterated it was acting under administrative orders pursuant to the Illinois Supreme Court directives. The jury trial was rescheduled for February 16, 2021.

¶ 9 On February 2, 2021, pursuant to the administrative orders and directives from the Illinois Supreme Court, the February trial setting was vacated and stricken. Defense counsel reasserted his objection. The circuit court denied the defendant's objection and set the matter for jury trial on March 15, 2021. On March 10, 2021, defense counsel moved to continue the jury trial scheduled on March 15, 2021, and indicated the parties were negotiating. The circuit court granted the defendant's motion for continuance and reset the jury trial for April 19, 2021.

¶ 10 On April 12, 2021, the circuit court heard the defendant's motion to dismiss on speedy trial grounds. The circuit court denied the defendant's motion to dismiss based on the Illinois Supreme Court's order suspending all jury trials and speedy trial demands due to the COVID-19 pandemic and the subsequent orders entered by the Chief Judge's office. On April 19, 2021, the defendant moved to continue the jury trial, and stated that he had recently received new discovery from the State regarding a medical examination. The defendant's motion to continue was granted, and the case was set for a pretrial setting on May 11, 2021.

¶ 11    On May 11, 2021, the defendant requested another pretrial setting for time to obtain an expert witness. The matter was reset for June 1, 2021. Defense counsel requested further continuances until June 30, 2021. On June 30, 2021, the matter was set for jury trial on September 20, 2021. On September 17, 2021, the circuit court vacated and reset the jury trial setting to October 18, 2021, due to the county's high rates of COVID-19 and a quarantine of the state's attorney's office pursuant to the Chief Judge's order and the Illinois Supreme Court administrative order. On October 5, 2021, defense counsel moved to continue the jury trial to November 15, 2021, to allow time for defense counsel to file a motion *in limine* regarding new allegations against the defendant. The circuit court granted the defense's motion *in limine* to exclude this new allegation and the jury trial began on November 15, 2021.

¶ 12    On November 15, 2021, a jury was selected, opening statements were given, and the State began its case-in-chief. The State's first witness to testify was Deputy Shawn O'Leary. He testified that he was currently employed by the Fayette County Sheriff's Department as deputy and had been for five months. He had previously been employed as a police officer for Farina Police Department for almost two years. O'Leary testified that on July 7, 2020, he was on duty in Farina, and he received a call from Noelle Lamacchia with the Department of Children and Family Services regarding a report of sexual assault. He testified that the victim in the case, A.H., stated she had been molested by her stepdad, Robert Branham. O'Leary testified that he was present for a Child Advocacy Center (CAC) interview conducted with A.H. in Effingham, Illinois, on July 14, 2020. He testified that A.H.'s siblings, K.H. and J.H., were also interviewed. He testified Robyn Carr conducted the interviews, and that Noelle Lamacchia and Investigator Coody were also present. He also testified that he wrote a report regarding the interviews. O'Leary testified his next course of action was to interview Robert Branham.

¶ 13    On cross-examination, O'Leary testified that he interviewed the defendant, Robert Branham, a "couple" of days after the interviews with the victim and her siblings. That interview took place at the village hall in Farina, Illinois, and Investigator Coody and Noelle Lamacchia were present. He testified he and Coody confronted the defendant with the allegations, and that the defendant denied the allegations. O'Leary testified the interview was recorded using a bodycam camera. He testified that he did not know whether the recording of the interview had been lost or deleted due to it not being turned over to the state's attorney's office within 90 days.

¶ 14    On redirect examination, O'Leary testified that he confronted the defendant several times with the allegations in the interview. He testified he did not expect the defendant to confess. He testified that Farina Police Department has a 90-day policy for their bodycam videos. He testified that the recording was gone, and because it was not accessed within that 90-day window, it was automatically deleted.

¶ 15    On recross-examination, O'Leary testified that preserving evidence is part of the training to become a police officer. He testified that the department got new body cameras around that time, and he did not know "exactly" how the software worked to save the recording.

¶ 16    Robyn Carr was the next witness to testify. She testified that she was employed as the executive director of the Children's Advocacy Center of East Central Illinois. She testified she was previously the senior forensic interviewer. Carr testified she completed her forensic interview training in October of 2015 and had conducted over one thousand interviews. She testified her CAC is nationally accredited by the National Children's Alliance. Further, she testified that she completed approximately 40 hours of classroom training, which included practical mock interviews, and she is required to participate in continuing education related to child maltreatment, forensic interviewing, and peer review. Carr testified regarding the typical procedure for CAC

6

interviews. That the interviews take place one-on-one with the child with a live audio and video feed that allows other investigators and law enforcement to listen and observe. She testified that she conducted an interview with A.H. on July 14, 2020, in Effingham, Illinois, in accordance with the standard protocols and procedures.

¶ 17    On cross-examination, Carr testified that all human beings, including children, do not always tell the truth. On redirect examination, Carr testified that the role of a forensic interviewer is to collect information, not to determine whether a child is making truthful statements; however, if a child is making conflicting statements, she would explore that with the child during the interview.

¶ 18    On November 16, 2021, the State continued its case-in-chief, and J.H. was the next witness to testify. He testified that he was 13 years old and attended South Central Middle School. He testified he had lived in Farina, Illinois, for eight years, and his mother is Brandy Hatfill. In March of 2018, he was 10 years old. He testified he lived with his mother, five siblings, and his stepfather, Robert Branham. J.H. testified the defendant had been his stepfather for 11 or 12 years and that he had an "okay" relationship with him. He testified that the defendant and A.H. had a close relationship that seemed unusual to him, "too close." He testified that A.H. was with the defendant everywhere he went. He testified that he observed the defendant touching A.H.'s breasts while she was playing video games in the bedroom that A.H. and her sister shared. J.H. drew a diagram of his sisters' bedroom, and that illustration was later admitted into evidence for demonstrative purposes as People's Exhibit 1. He further testified that only the defendant and A.H. were in the bedroom during this incident and that neither of them saw him. He then walked outside where his other siblings were present, and later returned to the bedroom where he observed the defendant and A.H. naked. J.H. testified that A.H. was bent over the bed holding herself up with her hands

7

and the defendant was standing behind her with his pants down, completely naked. He then clarified that the defendant and the victim were naked from the waist down. He testified that the defendant and A.H. saw him, and they hurried and pulled their pants up. J.H. testified that he walked outside and told his older sister and that information was later relayed to his mother. He further testified that shortly after this occurred, the defendant told him he was allowed to ride his bike, which he had been previously grounded from using.

¶ 19    On cross-examination, J.H. testified that the defendant has previously grounded him from his bike, that the defendant has disciplined him in the past, and has employed methods such as standing in a corner and spanking or smacking him. He testified that he does not like the defendant but they had gotten along in the past. He testified that he has told the defendant on more than one occasion that he will be glad when the defendant is gone. J.H. then recalled one occasion when the defendant responded that he was not going anywhere, and J.H. responded, "You'll see." He testified that his whole family was home during the incident when he observed the defendant touching the victim's breasts. That the incident occurred sometime in the summer of 2018. He testified that Cassandra Roley, his mother's girlfriend, was not at home during the incident. He testified that approximately 10 minutes passed between when he observed the defendant touching the victim's breasts and the second incident on the bed. J.H. testified that he did not recall whether he mentioned the first incident during the CAC interview. He testified he believed the defendant favored A.H. and her sister over him. He testified that the defendant and his mother were never married. The minor testified that A.H. would follow the defendant around on her own and not at the defendant's direction. He testified that A.H. used marijuana regularly during this time period. He testified she told him she got it from a friend in Farina, Illinois.

8

¶ 20    On redirect examination, J.H. testified that the defendant gave him no explanation why he was no longer grounded from his bike. He testified that on one occasion the defendant smacked him 5 or 10 times when he argued with the defendant. He recalled one incident when the defendant smacked him on the back which caused a scratch and bleeding. He testified he believed the defendant allowed him to ride his bike due to him observing the second incident. He testified the defendant was "always around the girls" and sometimes around the boys. He testified the girls would hang around the defendant in his bedroom.

¶ 21    On recross-examination, J.H. testified that his mother was made aware of the incident because he told K.H., who told Cassandra, who told his mother. He testified his mother was told within an hour and a half of the incident. He testified that his mother did not confront the defendant with her knowledge of the incident until two years later when she kicked him out of the house.

¶ 22    On further redirect examination, J.H. testified he was not one hundred percent sure of the timeframe regarding when his mother confronted the defendant about the incident. On further recross-examination, J.H. testified his mother did not kick the defendant out of the house the same day of the incident. He testified it was "maybe a month" before his mother confronted the defendant and kicked him out of the house.

¶ 23    A.H., the minor victim, was the next witness to testify. She testified she is currently 17 years old and living in Virginia. She testified, between March 5, 2018, and July 7, 2020, she lived in Farina, Illinois. On or about July 7, 2020, she made a report of sexual assault to her psychiatrist, Dr. Katie Hecksel. She testified that the police became involved, and she participated in a CAC interview with Robyn Carr. A.H. testified the incidents started when she was 13 years old. The first incident she remembered occurred when she was 13 years old while she was babysitting her brothers. She testified she went to wake up the defendant for help babysitting, and he pulled her

9

by the left arm into his bed and started touching her breast and vagina over her clothes. She testified the defendant began providing her with cigarettes, marijuana, and alcohol.

¶ 24     A.H. testified the next incident she remembered occurred at Sportsman Lake when she was 14 years old. She testified the defendant was taking her to her grandfather's residence, and they stopped at the camper at Sportsman Lake to get something for her grandfather. She testified she went to use the bathroom in the camper, and when she attempted to go back to the vehicle, the defendant prevented her from leaving. The defendant demanded that she undress, and she said no. The defendant then undressed her himself and pushed her onto a bed and stuck his penis inside her vagina. A.H. testified that when it was over, the defendant told her that if she ever told anyone, no one would believe her and threatened to hurt her family.

¶ 25     A.H. testified the next incident occurred in a shed/port-a-potty at Sportsman Lake. She testified that she was there fishing when she went to the shed to use the restroom by herself. While using the restroom, the defendant walked in the shed. She testified she pulled up her pants and attempted to leave, but the defendant told her she could not and stepped in front of the door preventing her from leaving. A.H. testified the defendant grabbed his penis, pulled it out, and forced her head to his crotch to perform oral sex. She testified that afterwards, the defendant threatened to hurt her family if she told anyone. She testified that the defendant ejaculated during the incident. A.H. testified that she removed a black hoodie she was wearing to wipe off her mouth and threw it away.

¶ 26     A.H. testified the next incident occurred near a wood stove behind her house. She testified she was 14 years old during the incident and it was wintertime. She recalled being outside at night with the defendant and holding a flashlight for the defendant as he was putting wood in the stove. She testified that after the defendant was done, he gave her a cigarette. The defendant then reached

10

into his pants and pulled out his penis. A.H. testified the defendant grabbed the back of her head and forced her down to perform oral sex. She testified the defendant held the back of her neck and head area. She testified she felt like she had no choice and could not resist.

¶ 27    A.H. testified the next incident occurred in her bedroom. She testified that she had a bruise on her lower back that was caused by a fight between her and a sibling. The defendant walked into A.H.'s room, and she asked him to see if she was bruised. She testified the defendant looked at her back and stated he could not see anything and pulled her pants down further "way past the bruise." She testified that the defendant pushed her over the bed, pulled down his pants, and was going to put his penis in her butt, but her little brother, J.H., walked in. She testified that the defendant did not penetrate her this time, because he was caught in the act by her younger brother.

¶ 28    A.H. further testified that the defendant sexually assaulted her twice a week. She testified that, at the time, her mother worked three jobs and was gone a lot. She testified the sexual assaults occurred a lot more than just the five incidents alleged in the indictments. She testified she never willingly took her clothes off or consented to having sex. A.H. further testified that between the dates of March 5, 2018, and July 7, 2020, the sexual assaults occurred twice a week.

¶ 29    On cross-examination, A.H. testified that the inappropriate touching or "molesting" began when she was 13 years old and lasted for a year. She testified that when she turned 14 years old, it progressed to a year of sexual assault or "rape." She testified she did not remember the last time that the defendant touched her sexually, but that she felt comfortable telling her psychiatrist after the defendant was no longer living in the home. A.H. testified she was seeing a psychiatrist because of an attempted suicide. She testified she did not tell her mother of the incidents, because she was concerned her mother would be disappointed.

¶ 30　On redirect examination, A.H. testified that when she told her psychiatrist about the sexual assaults, the defendant was no longer living in the house. She testified she believed molesting to mean "touching my boobs, my vagina, and my butt." She testified she believed rape to mean "he forced himself onto me. He forced sex on me." She testified that the defendant forced her to have sex twice a week. She testified she ran away on a couple of occasions, because she had fought with her mother and to get away from the sexual assaults committed against her by the defendant. She testified she moved to live with her father in Virginia to get away from the incidents.

¶ 31　Brandy Hatfill was the next witness to testify. She testified she was A.H.'s mother, she and the defendant had been in a relationship for approximately 12 years, and he was stepfather to the children. She testified she first learned about the incidents a week before Father's Day of 2020. She testified she kicked the defendant out of the home shortly after learning of the incident. She testified that during the relevant time period she worked two or three jobs, but also had a procedure on her back that required recovery for about six months in 2019.

¶ 32　On cross-examination, Brandy testified that Cassandra told her about the incidents. She testified that Cassandra told her that J.H. saw something inappropriate. The State then rested its case.

¶ 33　The defense's first witness to testify was Faith Runkel. She testified that she met the defendant in the summer of 2017, because her fiancé was friends with the defendant. She testified to a conversation that occurred near Father's Day of 2020 at Sportsman Lake between Brandy Hatfill and Cassandra Roley. She testified that she heard Brandy and Cassandra discussing the purchase of a home together, wherein Cassandra asked Brandy if she had spoken to the defendant about it, to which Brandy replied that the defendant would probably follow and move in with them.

She testified that Brandy seemed excited about the idea of purchasing a new home but had her doubts about the defendant being involved.

¶ 34    The defendant testified next for the defense. He testified to his relationships with Brandy, Cassandra, and the children. The defendant testified that over time he felt that Brandy and Cassandra were getting closer, and believed Brandy would eventually break off the relationship. He testified that he had never touched A.H. in a sexual manner and denied the specific accusations against him. He testified he did look at A.H.'s back in the middle of June of 2020 when she asked him. He testified she was by the bed, her shirt was up a little, he saw a big red spot on her back, her pants were up, and no underwear was showing. J.H. walked in during this and walked out. He testified he was never alone with A.H. inside the shed at Sportsman Lake but did enter the shed to clear out spiders and spiderwebs when she needed to use the restroom. He testified Brandy told him not to come back to the house the Saturday before Father's Day of 2020. He first learned of the sexual assault allegations on July 21, 2020, in an order of protection proceeding that he was not a part of. He spoke with law enforcement voluntarily on August 3, 2020, and denied the allegations.

¶ 35    On cross-examination, the defendant testified that he went to the Father's Day dinner with the family. He testified he was never alone with any of the children. He testified that he had sexual intercourse with Brandy and Cassandra. He stated that 2018 was the last time he had a sexual relationship with both Brandy and Cassandra. The defendant testified that he believed Brandy's invitation to move to the new house with Cassandra was an ultimatum. He testified that the incidents described by J.H. and A.H. did not happen. The defense then rested.

¶ 36    Following closing arguments, the jury retired to deliberate and returned a verdict finding the defendant guilty on all five counts of criminal sexual assault.

13

¶ 37    On December 20, 2021, defense counsel filed a posttrial motion for judgment notwithstanding the verdict or for a new trial. The defendant argued that the State failed to bring him to trial within 120 days of his arrest; that the circuit court erred by denying his motion for directed verdict on counts II, III, IV, and V; that the circuit court erred by giving the State's instruction defining "family member"; that the court erred by not allowing defense to question the victim regarding the medical examination performed on her; and that the evidence and testimony was insufficient to support a finding of guilt beyond a reasonable doubt.

¶ 38    On December 22, 2021, a presentence investigation report was filed by Tiffany Stone of the Fayette County Probation Department. Contained within that report was a statement from the defendant regarding the present offense, which states as follows: "Due to an improper, and incomplete representation by counsel, and evidence not being allowed, I do not feel I got a fair trial." On December 27, 2021, defense counsel filed a motion for leave to withdraw based on the statements made by the defendant in the presentence investigation report.

¶ 39    On January 3, 2022, the circuit court held a hearing first addressing the defense's motions and then held a sentencing hearing. Defense counsel requested the circuit court allow him to withdraw based on the defendant's statements in the presentence investigation report. The circuit court informed the defendant he does not typically allow counsel to withdraw after a jury trial and stated that he could represent himself or have counsel, but sentencing was going to proceed that day. The defendant indicated that he wanted counsel's representation at sentencing and the circuit court denied the motion to withdraw. The circuit court never made a preliminary inquiry into the defendant's ineffective claim. After hearing arguments from both parties, the court then denied the defendant's motion for a new trial or judgment notwithstanding the verdict. A sentencing hearing was held, and the defendant was sentenced to six years' imprisonment on each of the five counts

14

of criminal sexual assault, Class 1 felonies, with the sentences to run consecutively and a mandatory supervised release range of three years to life. The defendant filed a timely notice of appeal on January 28, 2022. Additional facts may be incorporated below in the analysis section where necessary.

¶ 40                                    II. ANALYSIS

¶ 41                                    A. Speedy Trial

¶ 42    On appeal, the defendant first contends that his right to a speedy trial was violated when the circuit court relied on administrative orders from the Illinois Supreme Court suspending jury trials during the COVID-19 pandemic. The defendant argues that because he was not tried until November 15, 2021, and he remained in custody awaiting trial for 225 days not attributable to him, his right to be tried within 120 days of his arrest pursuant to section 103-5(a) of the Code of Criminal Procedure of 1963, commonly known as the Speedy Trial Act (725 ILCS 5/103-5(a) (West 2020)), was violated. The defendant asserts that the Illinois Supreme Court emergency orders tolling the Speedy Trial Act during the COVID-19 pandemic violated the basic principles of separation of powers, as well as federal sixth and fourteenth amendment principles, and were therefore unconstitutional. As a result, the defendant argues the circuit court incorrectly denied his motions to dismiss the charges on speedy trial grounds.

¶ 43    Whether a defendant's statutory right to a speedy trial was violated is reviewed *de novo*. *People v. Pettis*, 2017 IL App (4th) 151006, ¶ 17. In this case, the defendant was arrested on August 3, 2020, remained in continuous custody, and was tried on November 15, 2021. The defendant asserts that during his time in custody, there are 225 days of delay attributable against the State. Of those 225 days, 134 of them were attributed by continuances granted pursuant to the Illinois Supreme Court emergency administrative orders in response to the COVID-19 pandemic,

15

and thus 91 days were attributable to continuances by the State. Absent the continuances relating to the COVID-19 pandemic, there was a total of 29 days left on the speedy trial term.

¶ 44 The defendant's reply brief filed on March 29, 2023, acknowledges the Illinois Supreme Court's decision in *People v. Mayfield*, 2023 IL 128092 (filed Mar. 23, 2023), as controlling. The *Mayfield* court held that its administrative orders tolling the speedy trial statute did not violate the separation-of-powers clause. The supreme court began its analysis of the issue by first addressing the Speedy Trial Act. The Speedy Trial Act provides in pertinent part:

> "(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant ***. Delay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." 725 ILCS 5/103-5(a) (West 2020).

*Mayfield*, 2023 IL 128092, ¶ 19. However, section 16 of article VI of the Illinois Constitution provides in pertinent part that "[g]eneral administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised by the Chief Justice in accordance with its rules." Ill. Const. 1970, art. VI, § 16. Section 7 of article VI further states, "[s]ubject to the authority of the Supreme Court, the Chief Judge shall have general administrative authority over his court, including authority to provide for divisions, general or specialized, and for appropriate times and places of holding court." Ill. Const. 1970, art. VI, § 7(c); *Mayfield*, 2023 IL 128092, ¶ 28.

¶ 45 The *Mayfield* court reasoned that because the Speedy Trial Act involves the scheduling of trials, the statute is a matter of court procedure and within the supreme court's constitutional authority over all state courts. Where a statute and a supreme court rule governing court procedure

16

cannot be reconciled, the statute must give way to the rule, finding that the Illinois Supreme Court's administrative orders tolling the speedy trial statute did not violate the separation-of-powers clause. *Mayfield*, 2023 IL 128092, ¶ 3. Furthermore, the supreme court found that the circuit court in *Mayfield* was not bound by the speedy trial statute, because it had expressly permitted tolling under its general administrative and supervisory authority over all courts and rejected the notion that the administrative orders concerning court procedure exceeded the supreme court's authority explicitly conferred by the state constitution. *Id.* ¶ 36.

¶ 46    Here, the circuit court relied on the Illinois Supreme Court's administrative orders, as well as the Chief Judge's administrative orders, tolling the 120 day time period set forth in the Speedy Trial Act. The circuit court entered an order to that effect on either November 16 or November 18, 2020. A time at which the defendant's in-custody time was within the 120-day time period. Thus, the subsequent in-custody time attributable to the Illinois Supreme Court's and circuit court's COVID-19 administrative orders tolling the defendant's speedy trial term does not violate his statutory right to a speedy trial, and pursuant to the Illinois Supreme Court's ruling in *Mayfield*, the defendant's claim must fail.

¶ 47                              B. Sufficiency of the Evidence

¶ 48    The defendant next argues that the evidence adduced at his jury trial was not sufficient to sustain his convictions for criminal sexual assault. To sustain a conviction on count I, the State must prove that the defendant committed an act of sexual penetration upon the victim by the use of force. 720 ILCS 5/11-1.20(a)(1) (West 2020). To sustain convictions on the remaining four counts, the State must prove that the defendant committed an act of sexual penetration, and is a family member of the victim, and the victim is under 18 years of age. *Id.* § 11-1.20(a)(3).

17

¶ 49    When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416. As we undertake our review of the evidence under the above standard, we are mindful of the fact that it is axiomatic in Illinois that the testimony of a single witness, if positive and credible, is sufficient to sustain a criminal conviction, even if the testimony is disputed by the defendant. See, *e.g.*, *People v. Loferski*, 235 Ill. App. 3d 675, 682 (1992).

¶ 50    In this case, the defendant first contests whether the evidence, specifically the testimony of the victim, was sufficient to sustain convictions on all counts. He contends, *inter alia*, the State's case relied entirely on the victim's testimony as it was the only evidence that he committed the five sexual assaults, and that his convictions should be reversed because the victim's accusations are insufficient given the nature of her testimony, the unlikelihood of her assertion that the defendant assaulted her twice a week for two years, and the uncontradicted evidence showing that

she was a troubled adolescent. He argues that the nature of the victim's testimony was highly suspect, because (1) her testimony was inconsistent with regard to the timeframe of when the sexual assaults occurred and varied from prior interviews; (2) her testimony that the defendant sexually assaulted her twice a week for a year was improbable considering the family of seven lived in a small house, there was no door on the victim's bedroom, one of the incidents took place while the family was at home, the mother was at home for several months with an injury, and the defendant testified he was working 12 hours during the day; and (3) she was a "troubled adolescent" with instances of prior drug and alcohol use, running away from home, and a previous attempt to take her own life.

¶ 51    The defendant also argues that the State did not present any physical evidence, and the testimony of the other family members was not corroborating evidence to support the victim's allegations, or the offenses as charged against the defendant. As such, the defendant argues that under these circumstances, no rational trier of fact could conclude that the State proved the defendant sexually assaulted the victim beyond a reasonable doubt. In the alternative, the defendant argues that his convictions on counts 3 through 5 should be reversed as the State presented insufficient evidence of the specific acts of penetration. He argues that he was charged with and convicted on four separate acts of vaginal penetration, but the victim only testified specifically to one vaginal penetration, while testifying generally to the defendant sexually assaulting her twice a week for a year. The defendant argues that this generic assertion is insufficient to establish three additional acts of vaginal penetration, and his convictions for those counts should be reversed.

¶ 52    In its brief on appeal with regard to this issue, the State acknowledges that the evidence at trial revolved around the testimony of the victim, but argues that the testimony of the victim's

brother, J.H., despite it relating to an incident not charged and being the only account of a sexual assault witnessed by anyone in the family, corroborated the victim's account of the occurrences and provided an opportunity for the jury to hear evidence supporting the victim's allegations. Further, the State argues that the jury had the opportunity to see and hear all the evidence, including the victim's testimony recounting the events, and the jury is in the best position to determine the credibility of the witnesses. The State emphasizes that the question before this court is whether the evidence was so improbable or unsatisfactory that no rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. In addition, the State argues that, contrary to the defendant's assertion, the victim's testimony at trial was consistent regarding the timeframe of when the incidents took place in that she firmly maintained that she was molested for a year after her thirteenth birthday and raped for a year after she turned 14. Further, the State argues that this court should give no weight to the defendant's claim that the victim's testimony was insufficient to establish the offenses as alleged in counts 3 through 5, because the victim testified she was sexually assaulted by the defendant twice a week for a year, and that the sexual assaults occurred a lot more than the five instances of sexual penetration at issue during trial. As a result, the State argues that the evidence was sufficient to support each conviction against the defendant beyond a reasonable doubt, and the defendant failed to establish that the fact finder acted irrationally when reaching their verdict.

¶ 53   In his reply brief, the defendant emphasizes that although reviewing courts generally give deference to the fact finder on matters of credibility, this court must still carefully consider the evidence and determine whether it is sufficient to sustain the convictions. Further, the defendant argues that the State is mistaken that J.H.'s testimony corroborates the victim's testimony, because J.H. testified about incidents he observed between the defendant and victim not charged in the

indictments. Lastly, he argues that the State failed to present specific evidence of vaginal penetration in regard to counts 3 through 5, and therefore, the evidence presented was insufficient to sustain his convictions on those counts.

¶ 54     As explained above, when reviewing a sufficiency of the evidence claim, this court allows all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial, and will not disregard such reasonable inferences that flow from the evidence. See, *e.g.*, *Saxon*, 374 Ill. App. 3d at 416-17. Moreover, we (1) do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact, and (2) will not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id.* As such, we will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or on the credibility of witnesses unless the evidence is "so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of [the defendant's] guilt." *People v. Abdullah*, 220 Ill. App. 3d 687, 693 (1991).

¶ 55     As alleged in count I, criminal sexual assault is committed when the accused commits an act of sexual penetration by the use of force. As alleged in the remaining counts, criminal sexual assault is committed when the accused is a family member of the victim and commits an act of sexual penetration against a victim under 18 years of age. 720 ILCS 5/11-1.20 (West 2020). Criminal sexual assault requires an act of sexual penetration; however, it is not necessary that corroborating medical evidence be admitted to prove that penetration did occur, and where evidence of penetration is presented at trial, question of whether it occurred is one of fact for jury to determine. *People v. Morgan*, 149 Ill. App. 3d 733, 738 (1986). Sexual penetration is defined

21

as, "any intrusion, however slight, of any part of the body of one person *** into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." 740 ILCS 22/103 (West 2020). The type of sexual penetration that constitutes the sexual assault is not an essential element of the offense, and the State is not required to prove the specific type of sexual penetration, but only that *a* type of sexual penetration occurred. *People v. Tanner*, 142 Ill. App. 3d 165, 168-69 (1986).

¶ 56     The evidence that was presented to the jury is described in detail above, and when viewed in the light most favorable to the prosecution, that evidence was sufficient, beyond a reasonable doubt, to sustain the convictions on appeal. Although the victim was uncertain of the specific dates of when the sexual assaults occurred, she firmly maintained that she was molested for a year after her thirteenth birthday and raped for a year after she turned 14. During her testimony at trial, she gave detailed accounts of the specific facts and circumstances surrounding the sexual assaults. Further, she testified that the defendant raped or forced her to have sex twice a week for a year. This testimony is sufficient to establish that the defendant committed several acts upon the victim which fall within the statutory definition of sexual penetration. Specifically, we conclude that the evidence in its totality, including the victim's testimony, despite her living arrangements and her struggle with drug use and mental health issues, was not so improbable or unsatisfactory as to create a reasonable doubt of defendant's guilt. In addition, we find that the victim's testimony that the defendant raped or forced her to have sex twice a week for a year was sufficient to prove sexual penetration as alleged in counts 3 through 5, and the State was not required to prove the specific type of sexual penetration. It was within the province of the jury to determine the weight to be given that testimony and to find it credible. Thus, there was sufficient evidence in the record to

support the jury's finding that the defendant committed each sexual assault beyond a reasonable doubt, and the principles of double jeopardy do not apply.

¶ 57                                    C. Plain Error

¶ 58    We next turn to defendant's contention on appeal that prejudicial plain error occurred by the prosecution in its cross-examination of the defendant and in closing arguments, which the defendant contends requires this court to reverse his conviction and remand for a new trial. The defendant concedes that the purported errors during the State's cross-examination of the defendant and closing arguments were not objected to in the trial court, and accordingly are forfeited. However, the defendant asks this court to consider the purported errors under the first prong of the plain-error rule.

¶ 59    The defendant contends that the State erred during cross-examination of him because, according to the defendant, the State improperly questioned the defendant about the credibility or veracity of J.H.'s and A.H.'s testimonies, in that the prosecutor asked the defendant if J.H. and A.H. were "lying." Further, he claims that the State erred during closing arguments when it commented on the line of questioning regarding whether the children were lying. Specifically, the defendant points to the State's arguments that because the defendant's and the children's testimonies contradicted each other, someone must be lying; and therefore, suggested the defendant is the one who should not be believed. The defendant argues these alleged errors intruded on the jury's function of determining the credibility of the witnesses and were an attempt by the State to shift the burden of proof to him.

¶ 60    In response, the State argues that no reversible error occurred. Additionally, there can be no plain error because, although it is generally improper to ask a witness on cross-examination whether an adverse witness's testimony is truthful, here, the defendant invited that line of

23

questioning through the defense's theory of conspiracy and the defendant's own direct testimony. Further, the State argues it should be afforded an opportunity to question the defendant in order to explore his denial and any explanation that he may have in furtherance of his theory. The State also claims that the evidence against the defendant was not closely balanced. Accordingly, even if there was error, it is not reviewable under the plain-error rule because the error alone did not threaten to tip the scales of justice against the defendant.

¶ 61    In his reply brief, the defendant asserts that the State misrepresents the defense theory. The defendant contends that "the defense case was that A.H. did not want Robert at the house any more [*sic*] because she wanted to gain Brandy's approval." Therefore, the defense was not about conspiracy, but merely a credibility determination between the defendant and A.H., thus the questioning was improper. In addition, he argues that the case was closely balanced and hinged on a credibility determination between the defendant and A.H.

¶ 62    It should initially be noted defendant failed to object to these questions and remarks at trial and did not raise this issue in a posttrial motion. In order to preserve an alleged error for appeal, a defendant must both object to the error at trial and in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant has done neither and has thus waived any consideration of this issue.

¶ 63    Despite this, defendant argues the questioning and remarks constitute plain error, an exception to the general rule of waiver. The defendant cites Illinois Supreme Court Rule 615(a), which states: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The plain-error rule is applied in instances of error "when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against

24

the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 64     We begin our analysis of this issue with the well-established—and dispositive—proposition of law that " '[a]bsent reversible error, there can be no plain error.' " *People v. Burton*, 2012 IL App (2d) 110769, ¶ 15 (quoting *People v. Naylor*, 229 Ill. 2d 584, 602 (2008)). Accordingly, when asked to conduct plain-error review following a criminal conviction, this court will not reach the question of whether the evidence in the case is closely balanced—and thus whether a forfeited claim is reviewable under the first prong of the plain-error rule—unless we have determined first that an error has occurred that would require reversal of a defendant's conviction. *Id.* ¶¶ 14-15. If the acknowledged errors do not amount to reversible errors, the plain-error rule does not apply, regardless of whether the evidence is closely balanced. *Id.* ¶ 18.

¶ 65     In this case, the prosecutor's questions and remarks were not reversible error. It is generally improper to ask one witness to comment directly on the credibility of another witness. *People v. Becker*, 239 Ill. 2d 215, 236 (2010). However, when this line of questioning is invited by the defendant's theory of the case, cross-examination eliciting the defendant's comments on the veracity of adverse witnesses is not necessarily improper. *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989). Here, despite the defendant's assertion that his defense theory was not that the witnesses were conspiring against him to remove him from the home, it is clearly evident that defendant's position was that the children were fabricating the allegations against him for that purpose. During his direct testimony, the defendant introduced evidence that his relationship with Brandy was deteriorating, that A.H. was often concerned about disappointing Brandy, that A.H.

25

felt she could not do anything good in her mother's eyes, and that he felt he was given an ultimatum by Brandy about moving to the new house. Moreover, he directly contradicted A.H.'s testimony by denying the allegations she made against him. All of this is evidence introduced by the defendant that Brandy did not want the defendant in the home, and this was A.H.'s opportunity to gain her mother's approval by fabricating the allegations. Further, during cross-examination, the defendant was the one who first testified that the children were making false allegations against him before the prosecutor ever questioned him on the veracity of their testimony. The following is the relevant line of questioning that occurred during the defendant's cross-examination:

"Q. So you don't think [J.H.] wanted you to leave?

A. Well, I didn't until now.

Q. Until now what?

A. Until this happened and these allegations were made. False allegations were made.

Q. [J.H.] is not the one accusing you though, right?

A. He is saying things that didn't happen. So, in a way, he's part of the allegations.

* * *

Q. But you just said that [J.H.] was making untrue accusations. But that did happen?

A. The part I looked at her back happened, the part that we had no clothes on didn't.

Q. He's just lying about that?

A. I suppose so, yes.

Q. He's lying?

A. Yes.

* * *

26

Q. Your testimony is that you didn't ever go into the shed at the same time as [A.H.] and she is lying?

A. That's my testimony.

Q. And she is lying?

A. Yes.

Q. So everybody else is lying but you?

A. I don't know."

¶ 66    We acknowledge that it is improper for a prosecutor to ask a defendant's opinion of the veracity of other witnesses because it invades the province of the jury to determine the credibility of the witnesses. However, in this case, the defendant's theory of defense combined with his testimony invited and provoked this line of questioning, especially when considering he testified first to the veracity of the other witnesses by stating they made false allegations. As a result, the prosecution was allowed to inquire further into the defendant's theory or version of the events following this testimony.

¶ 67    Further, the prosecutor's remarks during closing arguments were not reversible error. It is generally improper for a prosecutor to tell jurors that in order to acquit the defendant they must find all of the State's witnesses are lying. *People v. Jones*, 108 Ill. App. 3d 880, 888-89 (1982). Despite this general rule, the prosecutor may discuss the credibility of the defendant and the witnesses when it is based on the evidence or reasonable inferences therefrom. *People v. Childs*, 101 Ill. App. 3d 374, 377 (1981). Such comment is proper argument, *i.e.*, inferences based on the evidence, in cases where the defendant's testimony contradicts the testimony of significant State's witnesses. *People v. Pegram*, 152 Ill. App. 3d 656 (1987) (prosecutor's statement that either the defendant or the victim lied held not to be plain error).

27

¶ 68 In *People v. Roman*, the defendant's testimony contradicted the testimony of the victim, and in closing argument the prosecutor stated that in order to believe the defendant the jury would have to find the State's witnesses were lying. *People v. Roman*, 98 Ill. App. 3d 703, 706-07 (1981). The defendant's identification was not at issue in *Roman*. *Id.* Instead, the victim and defendant simply gave contradictory versions of the events in question, and it was not a situation where the witnesses could easily be mistaken. *Id.* The *Roman* court refused to find plain error as the comments were not lengthy and the prosecutor did not put his credibility behind the State's witnesses. *Id.* at 708. In this case, the following remarks were made during the State's closing and rebuttal argument:

"Is this a conspiracy? Everybody is lying but the defendant? No. Everybody's going to concoct a story that starts with a confession to your psychiatrist and involves all these people just to get somebody out of the house?

\* \* \*

For everything to not be true, everybody else has to be lying. That was one of the last points I made with the defendant. Everybody else has to be lying but him. He's the only one telling the truth. I submit that that [*sic*] is impossible.

\* \* \*

He would have you believe that Brandy had already decided to get rid of him, both the kids that are clearly lying decided to get rid of him, and this is a huge conspiracy because nobody is possibly telling the truth."

¶ 69 Here, as stated above, the defendant invited the line of questioning during his direct and cross examination and the resulting remarks during closing arguments. Further, contrary to the defendant's assertions, at no point did the prosecutor state that in order to acquit the defendant, the

jury must conclude the State's witnesses were lying. Instead, the main theme of the prosecutor's remarks was that either the defendant or the State's witnesses were lying. Thus, the prosecutor did not misstate the law or attempt to shift the burden to the defendant based on his remarks. In addition, there was a direct conflict of a significant nature between the children's testimony and that of the defendant, in a case largely resting on credibility. The two versions of what occurred simply cannot be reconciled. Furthermore, these are not matters about which a witness may easily be mistaken. When reviewing the evidence, it seems a reasonable inference, if not the only logical one, that either the children or the defendant was lying. Thus, the remarks were not improper under the circumstances, in that the defendant invited the initial line of questioning and the resulting remarks, and the prosecutor has a legitimate right to comment upon the credibility of the witnesses when based on evidence or reasonable inferences therefrom. Accordingly, there was no reversible error, and the plain-error rule is not applicable under the circumstances.

¶ 70                                  D. *Krankel*

¶ 71    We now turn to defendant's claim that this case must be remanded for a *Krankel* inquiry, based on the defendant's written statement contained in the presentence investigation report claiming ineffective assistance of counsel. "The issue of whether the [trial] court properly conducted a preliminary *Krankel* inquiry presents a legal question"; therefore, we will use a *de novo* standard of review. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 72    In 1984, the Illinois Supreme Court in *Krankel* announced the manner in which the court should handle ineffective assistance of counsel posttrial claims. *People v. Krankel*, 102 Ill. 2d 181 (1984). Since that time, and in accordance therewith, a common law procedure has developed that "is triggered when a defendant raises a *** posttrial claim of ineffective assistance of trial counsel." *Jolly*, 2014 IL 117142, ¶ 29. It is well-settled law that in such situations, the trial court

29

is not automatically required to appoint new counsel for a defendant. *Id.* "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *** motion." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). If, on the other hand, "the allegations show possible neglect of the case, new counsel should be appointed" to represent the defendant at a hearing on the defendant's claims. *Id.* This ensures that newly appointed counsel can independently evaluate the defendant's allegations, and it also avoids "the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to [the] defendant's position." *Id.*

¶ 73    To determine whether the appointment of new counsel is required, the trial court must take action. The first step is to "examine the factual basis of the defendant's claim." *Id.* at 77-78. To do this, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id.* at 78. The trial court may ask the trial counsel to "simply answer questions and explain the facts and circumstances surrounding the defendant's allegations." *Id.* Further, "[a] brief discussion between the trial court and the defendant may be sufficient" to assist the trial court in understanding the defendant's allegations. *Id.* Lastly, the trial court may base its evaluation of the defendant's allegations on its own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Id.* at 79.

¶ 74    The goal of a preliminary *Krankel* inquiry "is to facilitate the trial court's full consideration of" the defendant's claims. *Jolly*, 2014 IL 117142, ¶ 29. Moreover, by conducting the initial evaluation of the defendant's claims by such an inquiry, the trial court "will create the necessary record for any claims raised on appeal." *Id.* ¶ 38. To ensure this goal of the preliminary *Krankel*

inquiry is met, "[t]he law requires the trial court to conduct some type of inquiry into the underlying factual basis" of the ineffective assistance of counsel claims, and if no such inquiry is conducted, the cause must be remanded to the trial court for that purpose. *Moore*, 207 Ill. 2d at 79, 80. As the Illinois Supreme Court has recognized, even where a defendant's claims may ultimately be without merit, the trial court must afford " 'the defendant the opportunity to specify and support his complaints,' " and the trial court may not " 'precipitously and prematurely' " deny the defendant's motion. *Id.* at 80 (quoting *People v. Robinson*, 157 Ill. 2d 68, 86 (1993)).

¶ 75 However, as in any case that is remanded for a proper preliminary *Krankel* inquiry, if, after a proper inquiry and any results that may flow from it, the trial court ultimately determines that the defendant's claims are without merit, "the court may then deny the motion and leave standing [the] defendant's convictions and sentences." *Id.* at 81. If that happens, the defendant remains able to "appeal his assertion of ineffective assistance of counsel along with his other assignments of error." *Id.* at 81-82.

¶ 76 The Illinois Supreme Court has made clear that a *pro se* defendant is not required to do anything more than bring his claim to the court's attention and may do so orally or in writing. *In re Johnathan T.*, 2022 IL 127222, ¶¶ 24, 47. "[A] bare allegation of 'ineffective assistance of counsel,' without more, is sufficient to warrant a preliminary *Krankel* inquiry." *People v. Downing*, 2019 IL App (1st) 170329, ¶ 55 (citing *People v. Ayers*, 2017 IL 120071, ¶ 24); see also, *e.g.*, *People v. Patrick*, 2011 IL 111666, ¶ 39; *People v. Munson*, 171 Ill. 2d 158, 200 (1996) (all supporting the general proposition that a defendant is not required to file any sort of specific motion, and simply a letter or note to the court will suffice, and that even if the defendant does not specifically include the words "ineffective assistance of counsel" in the defendant's filing or oral statement, the allegations can be sufficient to require a *Krankel* inquiry).

¶ 77    In this case, the State concedes that this matter must be remanded for the limited purpose of a proper *Krankel* inquiry when the defendant's ineffective claims were brought to the attention of the trial court by defense counsel, and the court failed to conduct an inquiry into the defendant's allegations. We agree and remand this case with directions for the trial court to conduct a *Krankel* hearing.

¶ 78                                    III. CONCLUSION

¶ 79    For the foregoing reasons, we remand with directions for the trial court to conduct a hearing to address the defendant's ineffective assistance of counsel claims, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and to determine, based on the trial court's conclusion following the hearing, whether additional proceedings are required.


¶ 80    Cause remanded with directions.