NOTICE

Decision filed 12/02/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230096-U

NO. 5-23-0096

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 21-CF-68 |
| | ) | |
| BILLY W. TELLOR, | ) | Honorable |
| | ) | Tyler R. Edmonds, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice Cates and Justice Sholar concurred in the judgment.

**ORDER**

¶ 1 *Held*: We vacate the indecent solicitation of a child conviction and remand for a new trial on the solicitation to meet with a child and grooming convictions where the State failed to prove defendant guilty of indecent solicitation of a child but provided sufficient evidence to sustain defendant's solicitation to meet with a child and grooming convictions, and counsel provided ineffective assistance in failing to object to instructions that incorrectly defined an essential element of the offenses.

¶ 2 Defendant, Billy W. Tellor, appeals his conviction and sentence. Defendant asserts that the State failed to prove him guilty beyond a reasonable doubt, there were errors in the instructions, improper lay opinion testimony occurred, and the court erred in failing to conduct a preliminary *Krankel* inquiry. See *People v. Krankel*, 102 Ill. 2d 181 (1984). For the following reasons, we vacate defendant's indecent solicitation of a child conviction, and reverse and remand for a new trial on his solicitation of a child and grooming convictions.

1

¶ 3                                   I. BACKGROUND

¶ 4      On April 22, 2021, defendant was indicted on three counts, all of which stemmed from the communications between defendant—who was over the age of 17—and J.T.—who was under the age of 17 but older than the age of 13—that occurred between April 6, 2020, and September 14, 2020. Count I charged defendant with grooming in that he attempted to seduce, solicit, lure or entice J.T. to commit any sex offense as defined in section 2 of the Sex Offender Registration Act (730 ILCS 150/2 (West 2018)), or otherwise engage in any unlawful sexual conduct with a child, in violation of section 11-25(a) of the Criminal Code of 2012 (720 ILCS 5/11-25(a) (West 2018)). Count II charged solicitation to meet a child in that defendant, while using a computer, cellular telephone, or any other device, with the intent to meet J.T., solicited, enticed, induced or arranged with the child to meet at a location without the knowledge of the child's parent or guardian for a purpose other than a lawful purpose, in violation of section 11-6.6(a) of the Criminal Code of 2012 (*id.* § 11-6.6(a)). Count III charged indecent solicitation of a child in that defendant knowingly discussed, by means of the internet, an act of sexual conduct or sexual penetration with J.T. with the intent that the offense of aggravated criminal sexual abuse (*id.* § 11-1.60(d)) be committed, in violation of section 11-6(a-5) of the Criminal Code of 2012 (*id.* § 11-6(a-5)).

¶ 5      At trial, Chief Deputy Bart Hileman testified that he opened an investigation against defendant after J.T.'s mother, Christina T., came to the Union County Sheriff's office to report concerning messages between her daughter and defendant on Facebook messenger. After he obtained consent to search J.T.'s phone, Chief Deputy Hileman had the phone's data extracted. He also obtained documents from Facebook regarding both J.T. and defendant's accounts, pursuant to a search warrant. He identified defendant's Facebook account by pictures of defendant on the account and the account's associated phone number and email address.

¶ 6    Chief Deputy Hileman stated that he found information in the communications received from Facebook that suggested grooming occurred. He further stated that during his interview of J.T. confirmed much of the information he discovered in the Facebook data. The court admitted State's exhibit Nos. 1 and 2, which were the formal disclosures from Facebook concerning the profile picture of defendant's account that was messaging J.T. and their conversations, respectively.

¶ 7    Chief Deputy Hileman stated he did not find any direct discussion of sexually explicit content, but there were discussions "hinting at things like that." Chief Deputy Hileman testified that there was no discussion indicating that Christina consented to her daughter meeting up with defendant.

¶ 8    After the State asked the officer to describe the progression of someone trying to groom a minor, Chief Deputy Hileman replied that it begins with a friendly conversation to break the ice and establish rapport; then, the person tries to win the victim's confidence by giving them a feeling of self-worth or making the victim feel older than their age. The progression can be slow or rapid. Chief Deputy Hileman testified, "Based on my training and experience, along with reviewing everything in the Facebook [messages], I believe that [defendant] was grooming [J.T.]" Chief Deputy Hileman confirmed that at the time of the crime, defendant was 49 years old and J.T. was 15 years old.

¶ 9    On cross-examination, Chief Deputy Hileman testified that defendant was the first cousin of J.T.'s father. He stated he did not receive any messages from Facebook before August 7, 2020, at 2:44 p.m. He testified that Christina took over her daughter's phone around August 8, 2020. Chief Deputy Hileman agreed that he presumed defendant sent the messages from the fact that defendant owned the account. He also agreed that the messages did not contain explicit sexual

discussions, crude language, or requests for sexual favors. Defense counsel presented State's exhibit No. 2 and asked Chief Deputy Hileman to indicate where there was "hinting." Chief Deputy Hileman then read messages sent by defendant stating he and J.T. could go on a ride whenever she wanted.

¶ 10    On redirect examination, the State had Chief Deputy Hileman read portions of the messages between J.T. and defendant. The messages included defendant saying, "if you are like me, you are good at being bad at that age," "Wait till you get ungrounded, be on the safe side," and defendant stated they could go "see some sight like Bald Knob Cross or the cache thing in Karnak."

¶ 11    Chief Deputy Hileman testified that defendant also sent J.T. a Graphics Interchange Format (GIF), which he explained was a still or animated photograph. Defendant sent a GIF that had a pair of human lips with a tongue sticking out. Chief Deputy Hileman did not know if it was a photograph, cartoon, or a computer-generated imagery. He stated that, with the GIF, defendant sent a follow up message saying, "That would be more fun, LOL." Roughly a couple hours later, defendant sent a photo of the phrase "I hope your day is as nice as your butt" and stated that he would love to squeeze J.T.'s butt one day. He also sent a photo of a man and woman in bed, clothed, with a caption that stated, "Be with someone who will take care of you, not materialistically, but take care of your soul and your wellbeing, your heart and everything that's you." Later, defendant sent a photo with a caption that stated, "A vampire masturbating in front of a mirror. Bet you didn't see that coming." He also sent a photo of a man and woman, both lying in bed on their sides with the woman behind the man and her pelvic region against the male's buttocks. The photo captions the woman saying "Ka-Pow! I just came in you deep." Another

4

caption at the top of the photo stated, "If she don't annoy you and love you at the same time, she ain't the one."

¶ 12    Chief Deputy Hileman also stated that on September 15, 2020, at 8:14 p.m.,[1] J.T. asked defendant if he wanted to meet her at "Lisa's around six." Chief Deputy Hileman was unsure whether J.T. or Christina sent that message.

¶ 13    State's exhibit No. 2 showed the messages between J.T. and defendant's Facebook accounts. Based on the testimony at trial, it was undisputed that Christina sent all messages on and after August 8, 2020. State's exhibit No. 2 showed defendant messaged J.T.'s account on August 7, 2020, at 9:44 a.m.,[2] stating they could go on a ride together if she got bored or lonely. J.T.'s account replied on August 7, 2020, at 10:28 p.m., asking what defendant meant. He stated that he was messing with her. After J.T.'s account discussed her mother grounding her and that she was "not good at being bad," defendant stated that he was good at being bad at that age and learned "to get around obstacles." Defendant then stated to wait until she got ungrounded to "be on the safe side" and then they could go see a sight. He also stated that he would be at Candy's house to see Aunt Darlene the following day and indicated that J.T. might be able to go since Aunt Darlene was in hospice.

¶ 14    Around 12:14 a.m., on August 8, 2020, defendant asked if he would have time to see J.T. at her house. J.T.'s account declined, stating her mother and grandmother would catch her. About eight minutes later, defendant offered that when she got ungrounded, they could go out of town for a while and would be back before curfew. When J.T.'s account stated that J.T.'s mother would

---

[1]Facebook disclosures operated under the Coordinated Universal Time (UTC). Under the UTC, the message was sent at 8:14 p.m. on September 15, 2020. This State operated under Central Daylight Time (CDT) at that time. Under the CDT, the message was sent 3:14 p.m. on September 15, 2020.
    [2]As just noted, the Facebook disclosure operated under the UTC. However, our disposition states the date and time of the messages under CDT.

never let her go, defendant stated she would have to sneak out. The discussion then diverted to J.T. being pretty and defendant indicating everyone was an idiot for not wanting her. At roughly 12:46 a.m. on August 8, 2020, after some discussion about defendant's truck, J.T. indicated she was going to bed and each account said their goodbyes.

¶ 15 Defendant initiated contact again on September 14, 2020, at 8:32 p.m., asking if J.T. wanted to go for a ride to help him see Lisa. J.T.'s account replied that her friend told her that he was too old for her, and she told her friend that age was just a number. Defendant agreed, stating "age don[']t mean nothing" and stated, "Just going out to have fun not marriage." J.T.'s account stated J.T. was not getting married. Defendant stated he meant like best friends, like being there for one another, having a good time and laughing. When J.T.'s account stated it thought defendant liked J.T. differently, defendant stated "maybe one day later under age by law." He also stated that he was fighting his feelings and "if we can all keep a secret I'm ok." J.T.'s account said that J.T. was the queen of secrets and defendant replied he was the king. He also sent that he would love to be with J.T. and might try to let her drive because he knew she liked to ride. He further said he was always there for her.

¶ 16 During the same exchange on September 14, 2020, they continued to discuss their love for riding around in a car, and defendant eventually again asked if J.T. wanted to go for a ride. He said to let him know when she was ready to keep a secret, then referred to her as the "queen of secrets." J.T. declined. Defendant stated, "Now who's making excuses." He offered to bring ice cream to her house for everyone, and they could look up at the stars and talk. Defendant indicated he wanted a woman's perspective on his previous bad relationship and J.T.'s account asked if defendant thought J.T. was a woman. Defendant replied, "16 yep woman mature faster than boys do." They exchanged several messages regarding defendant's prior relationship.

6

¶ 17    Defendant then stated that due to this previous relationship, he knew what J.T. was going through "in life" and they could "keep each other in comfort" if she needed and his lips were sealed. J.T.'s account said she would keep that in mind, there was no room for her right now, and that she was going to go with a friend to the state forest that night. J.T.'s account also stated she would see defendant down there if he was not a chicken. Defendant stated he was too shy to go and J.T.'s account replied, she understood and did not "think this was anything anyway." Defendant asked when J.T. turned 16. Defendant then stated that he did not like jail. He also said J.T. was beautiful and she should be careful and get a knife because there were idiots that could hurt her. J.T.'s account stated J.T. could take care of herself and defendant stated that he would be in trouble when she was 17 because "they can say nothing." Defendant then stated he was scared because he heard of an arrest of a man who was just sitting on a tailgate talking with a girl while watching the stars. He also said that J.T. was okay with him, he would not do anything she would not want to do, and he knew "no" meant "no." He then threatened to break the legs of anyone who would hurt her.

¶ 18    At 11:05 p.m. on September 14, 2020, J.T.'s account indicated that J.T. was going to go to the campsite at the state forest with her friend. After defendant expressed concerns about her drinking and driving, J.T.'s account stated that defendant could come babysit if he wanted. Defendant said that he might and J.T.'s account sent a GIF of a chicken. Defendant called J.T. a chicken back because she would not hang out with him but went with her friend. Defendant then stated J.T. should be safe and J.T.'s account said she was going to be as wild as she could be while she was still young. Defendant indicated that sneaking out to take a ride with him would be wild, too.

7

¶ 19 Upon defendant saying that he had to go because his phone was dying, J.T.'s account said that he should charge his phone so they could swap pictures later. Defendant replied that he did not do nudes because he did not want to "get all hot" and do nothing about it. He also stated that J.T. should tell him when she will be at her Aunt Lisa's next so he could come and let her drive home on the back road.

¶ 20 Thereafter, still on September 15, 2020, the topic changed to what defendant was watching on television and J.T.'s account replied that watching television was not better than drinking at the campsite. Defendant stated that he did that when he was younger and J.T.'s account asked him to come and give pointers. He declined, stating he would be the oldest person and go to jail. He also stated, "I'll give you pointers all right but not there." They again talked about the show defendant was watching and J.T.'s account said that it sounded fun. Defendant then sent the GIF of a mouth with the tongue moving up and down, and a message saying, "that [would] be more fun." After defendant inquired about the power at J.T.'s house, he said that he better stop joking with J.T. and God might be mad at him. J.T.'s account sent a GIF of a chicken. Defendant said, "this is freaky" and that J.T. needed to be 18 years old by law. J.T.'s account asked if defendant wanted to go to the campsite since his power was off. He declined, stating that he was just joking and having fun. He also noted that they were related. J.T.'s account indicated that J.T. may not be blood-related to defendant, and he stated, "Still either way 17."

¶ 21 Five minutes later, after some discussion of their familial ties, defendant stated that they could "hook up" when J.T. was 17 or 18 years old and he would be more than happy to take care of her, give her a house, and give her a car. J.T.'s account stated that J.T. just started the fire and sent an illustration of the backside of a person in underwear with a paddle near the person's buttocks. Defendant replied, "Fire that a** up."

8

¶ 22    After about 40 minutes, at 1:22 a.m. on September 15, 2020, J.T.'s account asked defendant if he had heard of the song titled "WAP" by Cardi B. Defendant stated there was a lot of dirty content in the song and sent the titles of two other songs. Later, after some discussion of the campsite, defendant stated that he would not mind listening to those songs while "going at it in bed" and they were "pretty hot songs." J.T.'s account then stated J.T. was cold after getting out of the creek. Defendant asked if her "headlights" were on and stated, "little nipply." Defendant sent an image stating, "I hope your day is as nice as your butt." J.T.'s account asked if J.T. had nice buttocks and defendant answered affirmatively. He also said, "Love to squeeze some day." J.T.'s account sent, "Someday when? You know where I'm at now." Defendant replied, "not now[,] going to bed." Shortly thereafter, defendant sent the previously discussed images of a couple on a bed with a caption indicating to find someone who would take care of your soul, the photo regarding a vampire masturbating, the photo showing a woman laying behind a man with a caption joking and a woman is not the one if she does not annoy you. J.T.'s account stated that she needed a cuddle buddy to warm her and defendant said he could not help.

¶ 23    About half an hour later, at 3:33 a.m. on September 15, 2020, J.T.'s account stated her friend puked and was going to bed. Defendant said he would have been more romantic by placing a tarp in front, building a fire, and having candles, drinks, food, and a sleeping bag. About 11 hours later, at 3:14 p.m. on September 15, 2020, J.T.'s account stated that she would "be at Lisa's around 6" and asked if defendant wanted to meet there. Defendant said he would meet her there and would bring "some smoke." There were no further messages after that point.

¶ 24    J.T. testified that she knew about defendant almost her whole life because he was her second cousin, but she had only met him in person three times. She stated in 2020, when she was 15 years old, defendant messaged her, asking her to go on a ride with him. J.T. identified State's

exhibit No. 1 as a picture of one of defendant's Facebook accounts. She stated she told her mother when defendant started messaging her because the messages scared her. Her mother started monitoring her Facebook thereafter. Her mother also began sending messages from J.T.'s Facebook account as if they were sent by J.T. J.T. further explained she was scared because defendant never talked to her before, not even during family gatherings, and his messages were "weird."

¶ 25　When asked to clarify what was weird, J.T. replied that defendant told her to hit him up if she ever got bored or lonely. J.T. testified she believed defendant just wanted to hang out at first and then he kept asking her to sneak out. She said defendant spoke about visiting "Bald Knob Cross, Kaolin Pits, and like little, small, quiet places that nobody really goes to."

¶ 26　J.T. testified that the pictures sent by defendant "were all pretty disgusting." She said that there were multiple instances where defendant tried to make contact with her. Defendant waited around her school at dismissal a few times because he knew she walked with her friends a lot. There was one incident where she and her friends hid in a bush until defendant drove away. Defendant also chased her and her brother until they reached a road that led to their house. There were also multiple times defendant "popped up" at a place where J.T was located. She recounted one time she was waiting at a gas station for about an hour for a friend to pick her up and defendant showed up at the gas station, taking 45 minutes to an hour to get gas.

¶ 27　On cross-examination, J.T. stated that defendant began following her after she filed an order of protection against him, sometime in September or October 2020. She testified that defendant initiated contact on August 7 and August 8, 2020, and her mother sent the replies from J.T.'s account on August 8 and thereafter. J.T. stated she only replied to defendant on August 7.

¶ 28    Christina T., J.T.'s mother, testified that she was familiar with defendant's Facebook account and identified State's exhibit No. 1 as defendant's Facebook account. Christina testified that J.T. told her that defendant sent J.T. a couple of messages on Facebook messenger. Christina reviewed messages from April 2020 and August 2020. The messages made Christina uncomfortable because defendant and J.T. were not close and defendant wanted to go riding around with her. Christina felt defendant was trying to be more than a consoling cousin. She clarified that she did not feel this way until after defendant was persistent in trying to meet up with J.T. Christina testified that defendant never contacted her or spoke with her regarding the messages. He also never asked Christina if J.T. could drive with him. Christina testified that she took defendant's messages as sexual references.

¶ 29    On cross-examination, Christina testified that there was nothing inappropriate in the messages from April 2020. Christina clarified that J.T. sent "what do you mean" after defendant's first message on August 7 but the remaining messages from J.T.'s account were sent by Christina. She testified that the messages indicating J.T. was with friends in a creek or had tequila and was going to sneak out were untrue, and Christina sent them. She also agreed she asked defendant to meet at Lisa's house, who is J.T.'s aunt. Christina testified that she drove by Lisa's house at the time specified in her message to defendant and defendant was standing in the front yard.

¶ 30    Thereafter, the State rested. Defense counsel motioned for a directed verdict, and the court denied the motion.

¶ 31    Defendant testified that State's exhibit No. 1 was a picture of him and his late wife from one of his Facebook accounts, but that account was hacked, and he had not used that account since 2011. Defendant stated on September 15th or 16th, 2020, he was scrolling through Facebook when he saw J.T. made a post indicating that boys treated her badly and that she did not feel that she was

11

any good. Defendant took this to mean J.T. was thinking about self-harming, so he messaged her to lift her spirits. He stated he told her not to worry about boys, she was pretty, and she had amazing blue eyes. Defendant also said he told her to stay in school, graduate, marry a doctor, and the doctor would buy her a house. He stated that he did not mean anything sexual by those messages. Defendant denied messaging J.T. in April or August 2020. Defendant acknowledged that he told J.T. that age did not mean anything as long as you were in love with the other person, and when J.T. asked about their relationship, defendant said, no, they were related and J.T. had to be 18 years old. After defendant sent that message, he thought he should not have said that and told J.T. to wait until she was 18 years old. Defendant clarified that he was not referring to himself when he said, "wait until you are 18," and he was already romantically involved with someone at that point.

¶ 32 Defendant testified that their conversation continued and J.T., out of nowhere, told him that she was in the forest. He stated his intuition kicked in and he wanted to make sure she was safe, so he kept texting her. Defendant stated that J.T. then asked him if he wanted her to send a picture and he told her no. He also declined her invitation to meet her at the forest. Defendant denied ever making a reference to teaching J.T. how to drive or meeting her at Bald Knob Cross, the forest, Karnak, or Kaolin Pits. Defendant testified that he never sent J.T. a GIF of a mouth with a moving tongue. He stated the photos regarding having a nice butt and having an annoying partner were posted to his Facebook page and were not sent to J.T. He further stated he had no contact with J.T. in public after September 16, 2020.

¶ 33 Lisa Casey testified that defendant was her cousin and J.T. was her niece. Lisa stated that defendant does not go to her house, she does not see him, and her house was not a meeting place for defendant and J.T.

12

¶ 34    At the instructions conference, the State offered a modified Illinois Pattern Jury Instruction, Criminal, No. 11.65D (hereinafter IPI Criminal No. 11.65D) to define "sexual conduct" to further define the elements of the indecent solicitation of a child and grooming charges. Defense counsel agreed that a definition of sexual conduct should be given and did not object to the State's instruction. As such, the court gave the jury the State's instruction, which stated, "The term 'sexual conduct' means any intentional or knowing touching or fondling by the accused, either directly or through the clothing, of the victim, for the purpose of sexual gratification or arousal of the accused."

¶ 35    After the court provided the remaining instructions, the jury deliberated and found defendant guilty of all charges. On November 21, 2022, defendant filed a motion for a new trial and a motion for judgment of acquittal, both of which argued the State failed to prove defendant guilty of all offenses beyond a reasonable doubt. At the January 13, 2023, hearing, the court denied defendant's motion.

¶ 36    Thereafter, the cause proceeded to a sentencing hearing. The court heard arguments and sentenced defendant to 30 months' incarceration on all counts to be served concurrently at 50% with up to a year of mandatory supervised release (MSR). On March 10, 2023, the court entered an amended judgment setting the MSR to one year. On April 19, 2023, this court granted defendant's motion to file a late notice of appeal.

¶ 37                                   II. ANALYSIS

¶ 38    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt on all charges, Chief Deputy Hileman provided improper lay opinion testimony, the instructions were improper, and the court erred in failing to conduct a *Krankel* inquiry. Before we address the merits, we must first determine if any decision is required due to mootness.

13

¶ 39     "An appeal is moot if no actual controversy exists or when events have occurred that make it impossible for the reviewing court to render effectual relief." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10. "As a general rule, courts of review in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998).

¶ 40     Here, defendant was sentenced to 30 months' incarceration on each count with one-year MSR. Defendant's incarceration time was to be served at 50% and was reduced by 14 days, for time served. Thus, our review shows defendant's sentence, served at 50%, ended on or about March 29, 2024. In any event, defendant has been released from incarceration for these offenses.[3]

¶ 41     While the completion of a defendant's sentence moots any appeal of the sentence, the same is not true when the defendant calls "into question the validity of the conviction itself." *People v. Lynn*, 102 Ill. 2d 267, 272-73 (1984). Unlike an issue only challenging the sentence, "nullification of a conviction may have important consequences to a defendant." *Id.* at 273. Whereas here, the appeal concerns the validity of the conviction itself, completion of the sentence does not render the appeal moot. *Id.*; *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005); *People v. Campbell*, 224 Ill. 2d 80, 83 (2006). As such, we address the merits of defendant's appeal.

¶ 42     The State concedes defendant's *Krankel* issue and agrees this case should be remanded for a *Krankel* inquiry. Further, citing *People v. Frakes*, 2021 IL App (5th) 170434-U, ¶ 17, the State

---

[3]Illinois courts may take judicial notice at any time (see Ill. R. Evid. 201(f) (eff. Jan. 1, 2011)) and generally may take judicial notice of information on a government website. See *Kopnick v. JL Woode Management Co. LLC*, 2017 IL App (1st) 152054, ¶ 26 (collecting cases). The Illinois Department of Corrections website, https://idoc.illinois.gov/offender/inmatesearch.html (last viewed Nov. 2, 2025) confirms defendant has already been released from incarceration.

argues that there is no need to address the remaining issue because the case should be remanded for *Krankel* and the other issues may become moot after the *Krankel* hearing.

¶ 43    A successful *Krankel* claim only provides the relief of a new trial with new counsel. See *Krankel*, 102 Ill. 2d at 189. Yet, the double jeopardy clause precludes retrying a defendant "once it has been determined that the evidence introduced at trial was insufficient to sustain a conviction." *People v. Lopez*, 229 Ill. 2d 322, 367 (2008). Thus, a court must decide any sufficiency of the evidence issues because if successful, there would be no reason to remand for a *Krankel* hearing as defendant could not be retried. To do otherwise risks violating double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309 (1979).

¶ 44    While *Frakes* supports the State's contention that remand for *Krankel* without addressing the other issues can be appropriate, there is also authority choosing to address other issues despite a *Krankel* issue being asserted on appeal. See *People v. Branham*, 2024 IL App (5th) 220068-U, ¶ 3 ("We address these claims first because if the defendant prevails on any of these three claims, there is no need to remand for a *Krankel* inquiry due to the principles of double jeopardy which would bar the retrial of the defendant, or a new trial would be required."); see *People v. Rigg*, 2024 IL App (2d) 230136-U, ¶ 84 ("As we have already found that defendant received ineffective assistance of counsel warranting reversal, the [*Krankel*] matter is moot."). The record here demonstrates sufficiency of the evidence issues and that counsel provided ineffective assistance. *Infra*, ¶¶ 62, 79-82. Accordingly, under the circumstances of this case, we choose to consider defendant's other arguments.

¶ 45                      A. Sufficiency of the Evidence

¶ 46    Due process requires the State to prove each element of an offense beyond a reasonable doubt. U.S. Const. amends. V, XIV; Ill. Const. 1970, art. I, § 2; *In re Winship*, 397 U.S. 358, 364

15

(1970). When reviewing the sufficiency of the evidence, it is not our function on review to retry defendant or "substitute our judgment for that of the trier of fact." *People v. McLaurin*, 2020 IL 124563, ¶ 22. Rather, we review challenges to the sufficiency of the evidence by determining "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Harvey*, 2024 IL 129357, ¶ 19. In so doing, we review the evidence in the light most favorable to the State, which means "that all reasonable inferences from the record in favor of the [State] will be allowed." *Id.*

¶ 47 Under this standard, circumstantial evidence is sufficient to sustain a conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64. We give great deference to the trier of fact's determinations regarding the weight afforded to the evidence and witness credibility, but the determinations are not binding on this court. *People v. Gray*, 2017 IL 120958, ¶ 35. "A criminal conviction will not be set aside on a challenge to the sufficiency of the evidence unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 48 Defendant first argues that his solicitation to meet a child conviction cannot stand because the only reasonable inference from the evidence is that Christina had knowledge of any proposed meeting. He notes Christina sent messages acting like J.T. for most of their discussions, including going on a car ride and Christina suggested meeting at Lisa's house.

¶ 49 Defendant essentially argues that the solicitation to meet a child statute imposes liability only where the parents are—in fact—unaware of the potential meet ups. Such question requires us to interpret the statute, which we review *de novo*. *People v. O'Brien*, 197 Ill. 2d 88, 91 (2001).

¶ 50 Our primary objective in construing a statute is to ascertain and give effect to the legislature's intent. *Id.* at 90. The statutory language is given its plain and ordinary meaning and if

that language is clear and unambiguous the statute is applied without resort to further statutory construction aids. *Id.* "We look at the statute in its entirety, construing words and phrases, not in isolation, but in light of other relevant provisions." *People v. Reed*, 2025 IL 130595, ¶ 25. " '[P]unctuation is to be considered and given weight unless from inspection of the whole act it is apparent it must be disregarded in order to arrive at the intention of the legislature.' " (Emphasis omitted.) *In re D.F.*, 208 Ill. 2d 223, 234 (2003) (quoting *Illinois Bell Telephone Co. v. Ames*, 364 Ill. 362, 368 (1936)).

¶ 51    The solicitation to meet a child statute provides,

> "A person of the age of 18 or more years commits the offense of solicitation to meet a child if the person while using a computer, cellular telephone, or any other device, with the intent to meet a child or one whom he or she believes to be a child, solicits, entices, induces, or arranges with the child to meet at a location without the knowledge of the child's parent or guardian and the meeting with the child is arranged for a purpose other than a lawful purpose under Illinois law." 720 ILCS 5/11-6.6(a) (West 2020).

¶ 52    "Without the knowledge of the child's parent or guardian" is not surrounded by commas and thus not separated from the requirement of "solicits, entices, induces, or arranges with the child to meet at a location." As such, the phrase does not prescribe a standalone element of solicitation to meet a child. Rather, we find the phrase, in the context of the statute as whole, requires that defendant solicit the child to meet in secret from his or her guardians. This element was proven by the circumstantial evidence in the messages where defendant referred to having to keep secrets and asked J.T. to sneak out. The fact that Christina was actually aware of the potential

17

meetings does not render the evidence insufficient for defendant's solicitation to meet a child conviction.

¶ 53    Defendant next argues that the State failed to prove indecent solicitation of a child because there was no evidence that an act of sexual conduct was discussed via the internet and no proof of an intent to commit aggravated criminal sexual abuse. Defendant argues the only acts proposed between defendant and J.T. were "hook up" and "spank that a**," neither of which constitute sexual conduct under the law. He also asserts that the messages only contemplated those acts when J.T. turned an age when legally, she would no longer be considered a juvenile for the purposes of the statute.

¶ 54    Sexual conduct is an essential element of the indecent solicitation of child conviction. *People v. Delgado*, 376 Ill. App. 3d 307, 320 (2007). To sustain an indecent solicitation of a child conviction in this case, the State had to prove that defendant was 17 years old or older and "knowingly discusse[d] an act of *sexual conduct* or sexual penetration with a child or with one whom he or she believes to be a child by means of the internet with the intent that the offense of *** aggravated criminal sexual abuse be committed." (Emphases added.) 720 ILCS 5/11-6(a-5) (West 2020). Moreover, to prove an intent to commit aggravated criminal sexual abuse, the State necessarily had to prove defendant intended to commit an act of sexual conduct. See *id.* § 11-1.60(b)).

¶ 55    The Code defines "sexual conduct" as,

"knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused, or any part of the body of a child under 13 years of age, or any transfer or transmission of semen by the accused upon any part of the clothed or unclothed

18

body of the victim, for the purpose of sexual gratification or arousal of the victim

or the accused." *Id.* § 11-0.1.

¶ 56    We agree with defendant's argument with respect to many of the messages. Defendant's messages indicating a desire for a romantic relationship with J.T. when she was no longer legally a juvenile are disturbing but are not a discussion of sexual conduct. The GIF displaying a mouth and tongue moving up and down has a sexual nature but the conversation surrounding the GIF fails to imply the GIF meant sexual conduct. Defendant's statements about squeezing J.T. buttocks also do not fall within the scope of sexual conduct. See *People v. Nibbio*, 180 Ill. App. 3d 513, 517 (1989). The memes containing sexual references also do not constitute sexual conduct where they do not speak to fondling or touching of the sex organs, anus or breasts of J.T. Defendant's statement that he wished to hear songs while "going at it" in bed also did not refer to acts with J.T.

¶ 57    The evidence did reveal defendant stating that they could "hook up" when she was 17 or 18 years old. "Hook up" could encompass a range of behavior from hanging out to casual sex. See Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/hook%20up (last visited Nov. 14, 2025). (defining the verb form of "hook up" as "to become associated especially inworking or social relationship" or "to have a sexual encounter."). However, "the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Cline*, 2022 IL 126383, ¶ 34. In light of the other messages clearly referring to sexual behavior, J.T.'s breasts, and a desire to have a romantic relationship, we cannot say it would be unreasonable for a jury to find that defendant meant a sexual act that would fall within the sexual conduct definition.

¶ 58    Defendant also contends that his statement to "hook up" did not amount to "sexual conduct" because the suggestion to become physical was limited to when J.T. would no longer be

19

a juvenile. While the fondling of *any* body part for the purpose of sexual gratification constitutes sexual conduct only if the victim is 13 years old or younger, the other acts constituting sexual conduct have no age requirement. See 720 ILCS 5/11-0.1 (West 2020). Thus, viewing the evidence in the light most favorable to the State, we find the evidence sufficient to conclude defendant discussed sexual conduct.

¶ 59    Defendant also contends that State failed to prove an intent to commit aggravated criminal abuse. Citing *People v. Arndt*, 351 Ill. App. 3d 505, 514 (2004), *People v. Leonard*, 377 Ill. App. 3d 399, 401-02 (2007), and *People v. Scott*, 318 Ill. App. 3d 46, 56 (2000), he contends this element is typically proven by direct discussion of explicit sexual acts before arranging to meet for a sexual purpose. Defendant's argument is based on the premise that there was no discussion of "sexual conduct"—an argument we already rejected—and that there were no explicit sexual materials exchanged or messages requesting a meet up for any kind of sexual encounter.

¶ 60    " 'The specific intent required to prove the elements of the offense of solicitation can be inferred from the surrounding circumstances and acts of the defendant.' " *People v. Rexroad*, 2013 IL App (4th) 110981, ¶ 31 (quoting *People v. Ruppenthal*, 331 Ill. App. 3d 916, 920 (2002)). However, intent, like all elements of an offense, cannot be proven by "speculation or conjecture." *People v. Hatcher*, 392 Ill. App. 3d 163, 168 (2009). Moreover, the fact that a statement regarding sexual conduct occurred is insufficient to prove an intent to commit aggravated criminal sexual abuse *per se*; otherwise, there would have been no need for the legislature to also require the discussion be made with the intent to commit aggravated criminal sexual abuse. See *People v. Baskerville*, 2012 IL 111056, ¶ 25 (Courts have an "obligation to avoid a construction which renders a part of the statute superfluous or redundant, and instead presume that each part of the statute has meaning.").

¶ 61    Here, we find defendant's messages—while inappropriate—fall short of showing that defendant discussed the sexual conduct with the intent to commit aggravated criminal sexual abuse. Defendant suggested potentially engaging in sexual conduct when J.T. would be of legal age to engage in sexual behaviors with defendant. Such message is perturbing but does not indicate a willingness to engage in an act constituting aggravated criminal sexual abuse. The discussion was brief and limited, as it consisted of one message from defendant with the topic changing immediately thereafter. More importantly, defendant never explicitly requested sexual conduct or inquired into the sexual history or preferences of J.T.

¶ 62    We acknowledge that cases addressing solicitation usually find the requisite intent proven by the fact that a defendant goes to an agreed-upon place at an agreed-upon time to meet the child. See *Ruppenthal*, 331 Ill. App. 3d at 921 (Defendant "demonstrated his intent to commit the sexual acts by traveling to Illinois to meet 'Stacy,' whom he believed to be under the age of 17, at an arranged time and place."); *People v. Patterson*, 314 Ill. App. 3d 962, 969-70 (2000) (state proved defendant's specific intent to commit aggravated criminal sexual abuse by his arrival at agreed place and time and his admission that he was waiting for minor boy with name that detective assumed on internet); *Arndt*, 351 Ill. App. 3d at 514 (intent proven where "[W]ith a Viagra tablet in his pocket, defendant arrived at the agreed-upon place, at the agreed-upon time, wearing the clothing that he had described."). We also acknowledge that the evidence of Christina's testimony that she saw defendant outside of Lisa's house around 6, as agreed in the Facebook messages, supported an inference that defendant attempted to meet J.T. at a specified place and time. However, in the previous cases, the agreed-upon meeting was set in relation to defendant's overt discussions of sexual conduct. See *Ruppenthal*, 331 Ill. App. 3d at 918 (defendant specifically asked to meet the next day at the airport where they could go to the bathroom and have vaginal

21

intercourse); *Patterson*, 314 Ill. App. 3d at 965 (defendant set a time and place to meet immediately after the recipient of the defendant's messages accepted defendant's offer to provide oral sex); *Arndt*, 351 Ill. App. 3d at 508-09 (defendant discussed having sex at the agreed-upon time and place, in addition to previously attempting to set meet ups with the victim for the purpose of sex).

¶ 63    Importantly, here, defendant declined J.T.'s invitation to meet after defendant discussed hooking up in the future. He also declined similar invitations to the campsite throughout their conversation. J.T.'s request to meet at Lisa's house the following day, which defendant accepted, occurred around 15 hours after the mention of "hooking up." In the meantime, there were discussions over three and a half hours concerning various topics, none of which related to defendant's statement about hooking up in the future. As such, there is not a sufficient connection to the mention of sexual conduct in the future and the agreement to meet such that we can infer defendant discussed the sexual conduct with the intent to commit aggravated criminal sexual abuse. Under these circumstances, we find the State failed to prove defendant discussed sexual conduct with the intent to commit aggravated criminal sexual abuse. Despite the sexual nature of some of the messages, they simply were not the actions prohibited by the indecent solicitation of a child statute.

¶ 64    Defendant also contends the evidence failed to prove he groomed J.T. where none of the messages amounted to persuading J.T. to engage in sexual conduct with the sender. We disagree.

¶ 65    "Grooming is a method by which a person gains access to a child, builds trust with the child, and renders the child susceptible to sexual abuse." *People v. Barker*, 2021 IL App (1st) 192588, ¶ 61. To sustain the grooming conviction in this case, the State had to prove that defendant knowingly used the internet "to seduce, solicit, lure, or entice, or attempt to seduce solicit, lure, or entice, a child, a child's guardian, or another person believed by the person to be a child or a child's

22

guardian, to commit [criminal sexual abuse] \*\*\* or otherwise engage in any unlawful sexual conduct with a child or with another person believed by the person to be a child." 720 ILCS 5/11-25(a) (West 2020).

¶ 66    "[T]he grooming statute prohibits a broader range of conduct than does the indecent solicitation of a child statute." *People v. Vara*, 2016 IL App (2d) 140849, ¶ 43. Unlike the indecent solicitation to meet a child, the grooming statute does not require defendant to discuss sexual conduct with the specified intent. See 720 ILCS 5/11-25(a) (West 2020). Nor is the State required to prove defendant urged, commanded, or requested J.T. perform a sexual act. *Vara*, 2016 IL App (2d) 140849, ¶ 43. Grooming is a process, not a single act. *People v. Wallace*, 2025 IL App (4th) 241509-U, ¶ 24. " '[I]n the context of a sexual abuse case, "grooming" mean[s] "conduct intended to foster trust and remove defenses over time through a pattern of seduction and preparation, resulting in the child being willing and compliant to the defendant's sexual abuse." ' " *People v. Hubbell*, 2021 IL App (2d) 190442, ¶ 18 (quoting *Vara*, 2016 IL App (2d) 140849, ¶ 37, quoting *State v. Coleman*, 152 Idaho 872, 276 P.2d 744, 749 (Idaho Ct. App. 2012)).

¶ 67    An explicit persuasion or request to engage in sexual conduct is not required to prove grooming. For example, in *Hubbell*, 2021 IL App (2d) 190442, ¶¶ 3, 11, the defendant was convicted of grooming in that he used the internet to seduce, solicit, lure or entice the minor female victim to distribute photographs depicting the sex organs of the victim. The evidence showed that defendant sent a picture of his bare buttocks to the victim and said, "now it's your turn, LOL." *Id.* ¶ 6. When the victim threatened to report the message to police, the defendant asked her to keep it a secret. *Id.* Upon the victim asking defendant why he liked her, defendant stated that the victim was cute, he would like "to get with" her, and they could keep friendship if that was what she

23

wanted. *Id.* During his police interview, defendant apologized sending the photo and stated that he knew it was wrong, he felt like a pedophile. *Id.* ¶ 7.

¶ 68 The trial court denied defendant's motion for a directed finding, rejecting defendant's argument that the evidence was insufficient to prove he requested a picture of the victim's sex organs because the term sex organs did not include bare buttocks. *Id.* ¶ 9. The appellate court agreed the evidence was sufficient to prove grooming, stating,

> "Considering the definition of grooming, we cannot agree that the legislature intended that a defendant's use of a photo of his bare buttocks with the words 'now it's your turn, LOL,' must be read to mean that the defendant was soliciting or attempting to solicit only a photo of buttocks in return or was not otherwise 'grooming' the child." *Id.* ¶ 19.

¶ 69 It found under the circumstances of that case; a rational trier of fact could reasonably determine defendant sending a picture of his bare buttocks was—at least—"a first step in a process that the defendant hoped would lead the child to send a photograph of his or her sex organs." *Id.* ¶ 19. The court reasoned that the defendant stated he wanted "to 'get with' [the victim], which had a sexual connotation," asked the victim to keep it a secret, and admitted what he did was wrong. *Id.* ¶ 20. The court further noted that the defendant referenced keeping a friendship type thing if the victim desired, "indicating that his initial intent was something more." *Id.*

¶ 70 We similarly find defendant's messages here, as a whole, demonstrate the first steps in defendant's intent to commit unlawful sexual conduct. While the majority of the messages did not regard sexual conduct, as defined by statute, defendant peppered several sexual references and sexually charged messages in his discussions with J.T. Defendant also stated his desire to "squeeze" J.T.'s buttocks and be with her. Defendant attempted to build trust by being concerned

24

about J.T.'s well-being, asking for J.T.'s advice, and expressing that he was always there for her. Defendant also engaged in flattery by continuously complimenting J.T., indicating that anyone who did not want to be romantic with J.T. was an idiot, and threatening anyone who would harm J.T. Defendant also said that he would not do anything she would not want to do, which indicates that he wanted to do more. Moreover, the messages show defendant believed his own conduct was improper where he stated that he needed to stop making jokes because God might be mad at him. He also, at one point, stated the conversation was freaky and J.T. needed to be 18 years old by law.

¶ 71 While, at times, defendant acknowledged relations between the two could not happen until J.T. was no longer legally a juvenile, other messages implied the opposite. Defendant continuously attempted to meet J.T. and ride alone with her in a car while she was still a juvenile. Often, the messages concerning hanging out included an indication that the hangout should be in secret. Similarly, defendant stated that his lips were sealed if they wanted to comfort each other. Although defendant stated he did not "do nudes," his reasoning was that he would get all "hot" and could do nothing about it, indicating he would be aroused but could not engage in sexual behavior. Notably, immediately after that message, defendant asked J.T. to let him know when she would be at Lisa's house next so he could see her. In doing so, defendant provided the incentive that he would let J.T. drive home from Lisa's house. He also indicated age was nothing but a number and stated more than once that women mature faster than males. His messages could reasonably be interpreted as defendant disguising himself to appear as a responsible, law-abiding adult to build the trust of J.T. but also as being open to a romantic relationship if the relationship was kept a secret.

¶ 72 In light of the above, a rational trier of fact could find defendant "intended to foster trust and remove defenses over time through a pattern of seduction and preparation, resulting in the child being willing and compliant to the defendant's sexual abuse." (Internal quotation marks

25

omitted.) *Hubbell*, 2021 IL App (2d) 190442, ¶ 18. Defendant's flattery, attempt to build trust with J.T., and attempt to meet with J.T. alone, along with his statements regarding secrecy, the inappropriateness of their conversation, and sexual references, support an inference that defendant lured or enticed J.T. to commit an unlawful act of sexual conduct. As such, we find the evidence sufficient to sustain defendant's grooming conviction.

¶ 73                           B. Instructions Error

¶ 74    Defendant also contends that reversal is required based on the improper instruction for "sexual conduct." Defendant acknowledges he forfeited this issue by failing to object or raise it in a post-trial motion. However, defendant asserts counsel was ineffective for failing to object to the instructions, or alternatively, requests plain error review.

¶ 75    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 688 (1984); *People v. Albanese*, 104 Ill. 2d 504 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and counsel's errors resulted in prejudice. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland*, 466 U.S. at 694). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Erickson*, 183 Ill. 2d 213, 224 (1998) (quoting *Strickland*, 466 U.S. at 694).

26

¶ 76    Turning to the first prong of *Strickland*, we note that an attorney's decision on which jury instructions to tender is usually a matter of trial strategy that is generally immune from an ineffective assistance of counsel claim. *People v. Lemke*, 384 Ill. App. 3d 437, 450 (2008). However, such decision can support an ineffectiveness claim " 'if that choice is objectively unreasonable.' " *People v. Bruemmer*, 2021 IL App (4th) 190877, ¶ 53 (quoting *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 97). To decide whether counsel's actions in this respect were objectively reasonable, we must first decide whether the instruction was incorrect.

¶ 77    Jury instructions serve the important purpose of "convey[ing] the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). In determining the validity of the instructions, we must determine whether the instructions, taken as a whole, "fully and fairly announce the law applicable to the theories of the State and the defense." *Id.* at 65. Non-IPI instructions should be used with caution, but courts have the discretion to provide a modified version of the IPI instruction "where the facts of the case render the uniform instruction inadequate." *People v. Hines*, 257 Ill. App. 3d 238, 244 (1993).

¶ 78    In this case, the jury was instructed, "The term 'sexual conduct' means any intentional or knowing touching or fondling by the accused, either directly or through the clothing, of the victim, for the purpose of sexual gratification or arousal of the accused." In contrast, IPI Criminal No. 11.65D provides,

> "The term 'sexual conduct' means any intentional or knowing touching or
> fondling by [ (the victim) (the accused) ], either directly or through the clothing, of
> [ (the sex organ) (anus) (breast) ] of [ (the victim) (the accused) ] [any part of the

body of a child under 13 years of age], for the purpose of sexual gratification or arousal of the victim or the accused."

The IPI Criminal No. 11.65D mirrors the definition of "sexual conduct" in the Criminal Code, except the statute also provides that sexual conduct includes "any transfer or transmission of semen by the accused upon any part of the clothed or unclothed body of the victim." See 720 ILCS 5/11-0.1 (West 2020); *People v. Delgado*, 376 Ill. App. 3d 307, 316 (2007).

¶ 79 The contradiction between the instruction provided at trial and the statutory definition is obvious. The instruction at trial omitted the appropriate bracketed portions of the pattern instruction that would have specified that sexual conduct only relates to the touching or fondling of a sex organ, anus, or breast. See 720 ILCS 5/11-0.1 (West 2020). "Without the complete and accurate definition of 'sexual conduct' the instructions given were ambiguous and misleading." *Delgado*, 376 Ill. App. 3d at 317. As a result, the instruction provided at trial allowed the jury to find sexual conduct based on any touching of the victim for the purposes of sexual gratification, although "sexual conduct" encompasses only the touching of specific body parts. The instruction at trial thus misstated the law and allowed the jury to impose criminal liability on more conduct than allowed by the statute. We fail to see any reasonable trial strategy in failing to object to the instruction where the instruction was an incorrect statement of law and opened defendant to criminal liability for more conduct than was criminalized by the charged offenses. See *Rigg*, 2024 IL App (2d) 230136-U, ¶ 78 (counsel's performance was deficient where "the erroneous instruction made it easier to convict defendant"). Therefore, "[c]ounsel's failure to object to the defective instruction, or to tender an adequate one, was deficient performance." *People v. Potts*, 2021 IL App (1st) 161219, ¶ 193.

¶ 80    We also find this deficiency prejudiced defendant. "Jury instructions that incorrectly define the offense cause prejudice to a criminal defendant far more serious than instructions that do not include a definition of a term." *People v. Ogunsola*, 87 Ill. 2d 216, 223 (1981). Moreover, instructions concerning the elements of an offense are necessary to ensure a fair trial. *People v. Hooker*, 253 Ill. App. 3d 1075, 1085 (1993). While "sexual conduct" was an element of both grooming and indecent solicitation of a child (see 720 ILCS 5/11-25(a) (West 2020); *Id.* § 11-1.60(d)), it is not included as an element of solicitation to meet a child (*id.* § 11-6.6(a)). Instead, the solicitation to meet a child statute requires defendant to solicit to meet with a child for an unlawful purpose. *Id.* Given that grooming and sexual conduct are illegal acts that could have sustained the "unlawful purpose" element of the solicitation to meet a child, the incorrect instruction impacted this offense as well.

¶ 81    Although we find the evidence sufficient to support the convictions for grooming and solicitation to meet a child, we do not find the evidence was overwhelming. There were no overt messages discussing sexual conduct. As discussed above, defendant's message regarding "hooking up" could have been construed as a reference to sexual conduct in light of all the messages, but that was not the only reasonable inference. Given the vagueness of defendant's messages, repeated statements acknowledging he could not have a relationship with J.T. at this time, and initial refusals to meet with J.T. at the campsite, we find there is a reasonable probability sufficient to undermine our confidence in the outcome.

¶ 82    Accordingly, defendant has established that counsel provided ineffective assistance on this record. As such, there is no need for further determination of counsel's effectiveness by the trial court through a *Krankel* inquiry. See *Rigg*, 2024 IL App (2d) 230136-U, ¶ 84 ("As we have already found that defendant received ineffective assistance of counsel warranting reversal, the [*Krankel*]

29

matter is moot."). Although we reverse for a new trial on this basis, we address the remaining alleged error, as it is likely to recur during retrial. *People v. Grant*, 2016 IL 119162, ¶ 34 (instructing the appellate court to address any issues likely to recur on retrial); see *Dodds v. Western Kentucky Navigation*, 297 Ill. App. 3d 702, 709 (1998) (after reversing and remanding for a new trial, addressed any remaining issue likely to recur on retrial).

¶ 83                    C. Chief Deputy Hileman's Testimony

¶ 84    Defendant's last issue asserts that Chief Deputy Bart Hileman impermissibly testified to the ultimate question to be decided by the jury when he stated that defendant was grooming. We agree. Indeed, there were several statements made by Hileman which, on remand, should be considered by the trial court regarding their admissibility, should the defendant file the proper motion *in limine*.

¶ 85    In the first statement made by Hileman, he stated as follows:

> "[State]: Can you tell me, specifically, information regarding grooming that you might have discovered in there?
>
> [Hileman]: Grooming, based upon my training and experience, is trying to obtain trust, friendship, any kind of a—to cultivate a relationship with somebody younger in the case, that's what I have mostly worked. It would be a minor child by an older person, trying to establish rapport with them and laying a foundation for a future relationship."

¶ 86    Here, Chief Deputy Hileman was asked about present information he may have discovered as a part of his grooming investigation. He did not give the answer to that question. Instead, he testified as to what constituted grooming, based upon his "training and experience."

30

¶ 87    In addition to this testimony, the State asked Chief Deputy Hileman to describe the "typical progression of someone who's grooming a minor?" Again, Chief Deputy Hileman testified based on his "training and experience," and offered an explanation of what kinds of activities constitute grooming. Finally, the State asked the ultimate question. Specifically, Chief Deputy Hileman was asked whether he had an opinion regarding the defendant's conduct, to which Chief Deputy Hileman responded, "Based on my training and experience, along with reviewing everything in the Facebook, I believe that [defendant] was grooming [J.T.]"

¶ 88    Illinois Rule of Evidence 702 (eff. Dec. 1, 2011) requires a witness be qualified as an expert to testify to scientific, technical, or other specialized knowledge that will aid the trier of fact. Illinois Rule of Evidence 701 (eff. Dec. 1, 2011) concerns lay opinion testimony and provides that a non-expert witness is limited to testifying to opinions that are

"(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

¶ 89    Illinois Rule of Evidence 704 (eff. January 1, 2011) states, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." This rule does not contain the exception found in the comparable Federal Rule of Evidence 704(b) (eff. December 1, 2020), which states: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Therefore, it is permissible for a witness to offer an opinion

31

regarding an ultimate issue of fact to be decided by the jury, provided the opinion is otherwise admissible.

¶ 90 The question arises, then, under what circumstances the testimony of a witness is "otherwise admissible." The answer to this question requires that we return to the definition of whether a witness is deemed a lay opinion witness or an expert opinion witness.

¶ 91 A witness may provide both lay and expert testimony, and police officers are particularly likely to serve as a dual-capacity witness. *People v. Loggins*, 2019 IL App (1st) 160482, ¶¶ 82-83. However, "[a]ny given piece of testimony is either lay or expert testimony; it cannot be both." *Id.* ¶ 103; Compare Ill. R. Evid. 701(c) (eff. Dec. 1, 2011) with Ill. R. Evid. 702 (eff. Dec. 1, 2011).

¶ 92 We find *Loggins*, 2019 IL App (1st) 160482, ¶¶ 88-89, correctly explained the distinction, by stating,

> "To count as lay opinions, they must be based on the officer's personal observations of the underlying events, and they cannot require the officer to draw on any specialized knowledge or expertise. They must be opinions that anyone in the same position, not just a trained officer, would have been qualified to offer.
>
> * * *
>
> If the opinion rests 'in any way' on the officer's specialized knowledge, it is expert testimony, and it must meet the foundational requirements of Rule 702." (Internal quotation marks omitted.) *Id.*

¶ 93 In *Loggins*, the defendant was convicted of armed violence and the predicate offense of possession of a controlled substance with intent to deliver. *Id.* ¶ 1. At trial, a detective testified that, based on his "training and experience" as a narcotics officer, certain items recovered from the residence, including small plastic bags and inositol, were commonly used in the illegal drug trade.

32

*Id.* ¶¶ 11-12. The State did not tender, and the trial court did not qualify the detective as an expert. *Id.* ¶ 12. The *Loggins* court found the detective's testimony "relied on knowledge and expertise that he had acquired in *other* investigations, in the course of his specialized training, or some mix of the two." (Emphasis in original.) *Id.* ¶ 94. The court concluded, "[t]hese are the hallmarks of expert testimony," and the detective's testimony was therefore inadmissible lay opinion testimony. *Id.* ¶¶ 94-106.

¶ 94       Here, the State also did not offer Chief Deputy Hileman as an expert. While Chief Deputy Hileman testified that he was in law enforcement for 27 years, there was no evidence of the training and experience he relied upon in forming his opinions. He failed to specify the extent of his experience with grooming cases, any specialized knowledge he possessed regarding groomers, or specialized training in detecting grooming that he completed. As such, Chief Deputy Hileman was not qualified as an expert and remained a lay witness. *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001) (determining an officer was a lay witness where record reflects the officer was not qualified as an expert witness).

¶ 95       Yet, like *Loggins*, Chief Deputy Hileman's testimony that defendant groomed J.T. was not proper lay opinion testimony. Chief Deputy Hileman's belief that defendant committed grooming was premised on the text messages he discovered through his investigation and his experience working in law enforcement. See *Loggins*, 2019 IL App (1st) 160482, ¶ 94-95 (relying on narcotics officer's personal knowledge acquired through working past cases is specialized experience constituting expert testimony). He had no personal knowledge of defendant's intent in sending the messages. See *People v. Novak*, 163 Ill. 2d 93, 103 (1994) (personal observations are not based on secondhand knowledge). Indeed, Chief Deputy Hileman explicitly stated his opinion was based on his training and experience. Therefore, his testimony was inadmissible, and it was error for him to

33

render expert opinions without being qualified to do so. See *Loggins*, 2019 IL App (1st) 160482, ¶ 89, 100 (officer's testimony that use of inositol is a cutting agent for drugs was improper lay opinion where his opinion was based on his specialized training as a narcotics officer rather than his personal observations).

¶ 96 We raise the foregoing issues because it is "[prejudicial] when a police officer, as a recognized authority figure, informs the jury that it should believe a portion of the prosecution's case." *People v. Davila*, 2022 IL App (1st) 190882, ¶ 52; *Crump*, 319 Ill. App. 3d at 542. Chief Deputy Hileman defined grooming far beyond the statutory definition and then made a conclusion as to the ultimate question of guilt. See *Crump*, 319 Ill. App. 3d at 542 ("Lay witness testimony is especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the jury."). Accordingly, should the State intend on retrial to introduce opinions from Chief Deputy Hileman, a proper foundation should be laid in accordance with the rules of evidence. Defense counsel can ensure that the testimony to be offered by the State conforms with the rules by filing a proper motion *in limine*.

¶ 97                                    III. CONCLUSION

¶ 98 The State failed to prove defendant discussed sexual conduct with J.T. with the intent that an aggravated criminal sexual abuse be committed; however, the evidence was sufficient to support defendant's solicitation to meet a child and grooming convictions. Counsel provided ineffective assistance, requiring reversal, where he failed to object to the incorrect definition of an essential element of the offenses. Chief Deputy Hileman also provided improper lay opinion testimony. Accordingly, we vacate defendant's conviction for indecent solicitation of a child and reverse defendant's solicitation to meet a child and grooming convictions. We moreover remand

34

for a new trial, with appointment of new counsel, on the charges of solicitation to meet a child and grooming.

¶ 99    Vacated in part; reversed in part; remanded.